1
2025 CO 5Concerning the Application for Amendment of an Augmentation Plan of Independence Water and Sanitation District in Elbert County. Franktown Citizens Coalition II, Inc. and West Elbert County Well Users Association, Opposers-Appellants v. Independence Water and Sanitation District, Applicant-Appellee and Division 1 Engineer. Appellee Pursuant to C.A.R. 1(e) No. 23SA154Supreme Court of Colorado, En BancFebruary 10, 2025

          Appeal
from the District Court District Court, Water Division 1,
Case No. 19CW3220 Honorable Todd L. Taylor, Water Judge

         
Attorneys for Opposers-Appellants: Monson, Cummins, Shohet
& Farr, LLC David M. Shohet Colorado Springs, Colorado

2

         
Attorneys for Applicant-Appellee: Hayes Poznanovic Korver LLC
David S. Hayes Matthew S. Poznanovic Eric K. Trout
Denver, Colorado

          No
appearance on behalf of: Division 1 Engineer.

          CHIEF
JUSTICE MARQUEZ delivered the Opinion of the Court, in which
JUSTICE BOATRIGHT, JUSTICE HOOD, JUSTICE HART, JUSTICE
SAMOUR, and JUSTICE BERKENKOTTER joined.

3

         
MÁRQUEZ CHIEF JUSTICE

         ¶1
Independence Water and Sanitation District
("Independence"), a quasimunicipal special
district, intends to provide water services to a proposed
920-home residential development located on a 1,012-acre
property in Elbert County, Colorado (the "Subject
Property"). To do so, it will withdraw groundwater
underlying the Subject Property from the Denver
Basin[1] pursuant to a 2006 decree. See
generally In re Application for Water Rts. &an
Augmentation Plan of Grant Bentley in Elbert Cnty., No.
06CW59 (Dist. Ct., Water Div. 1, Sept. 5, 2006) (Findings of
Fact, Conclusions of Law, Ruling of the Referee, Judgment and
Decree, in the Nontributary Lower Dawson, Denver, Arapahoe,
and Laramie-Fox Hills and the Not Nontributary Upper Dawson
Aquifers) ("2006 Decree"). The 2006 Decree
established the amounts of nontributary and not-nontributary
groundwater[2]

4

available for withdrawal from the Denver Basin's four
aquifers and identified a host of uses for the water.
Id. at 2. It also approved an augmentation plan
permitting the use of a portion of the decreed
not-nontributary groundwater from the Upper Dawson aquifer
for two of those uses on the Subject Property. Id.
at 4. This case concerns Independence's application to
amend the augmentation plan in the 2006 Decree to permit the
specified portion of not-nontributary groundwater to be used
for all of Independence's decreed uses (plus
municipal use) and to allow such uses both on and off the
Subject Property.

         ¶2
Independence's application encountered considerable
opposition before the Division 1 water court. As relevant
here, Franktown Citizens Coalition II, Inc.
("Franktown") and West Elbert County Well Users
Association (collectively, "Opposers") moved for
summary judgment, arguing that the water court could

5

not approve Independence's application to amend its
augmentation plan because it could not make the threshold
showing of non-speculative intent required by the
anti-speculation doctrine. The anti-speculation doctrine is a
well-established principle of Colorado water law that
"precludes the appropriator who does not intend to put
water to use for [their] own benefit, and has no contractual
or agency relationship with one who does, from obtaining a
water use right." Colo. Ground Water Comm'n v.
N. Kiowa-Bijou Groundwater Mgmt. Dist., 77 P.3d 62,
78-79 (Colo. 2003). Opposers contended that Independence
could not satisfy the antispeculation doctrine because
Independence did not have specific plans to put a specific
amount of the augmented water to certain proposed uses.

         ¶3
In response, Independence claimed that under this court's
decision in East Cherry Creek Valley Water
&Sanitation District v. Rangeview Metropolitan
District, 109 P.3d 154 (Colo. 2005), the water court had
no authority to apply the antispeculation doctrine when
reviewing an application to amend an augmentation plan for
not-nontributary groundwater. Independence argued that such
authority lay instead with the State Engineer's Office
("SEO"), which applies the antispeculation doctrine
as part of its well permitting process.

         ¶4
The water court denied Opposers' motion, agreeing with
Independence's understanding of East Cherry
Creek and concluding that the anti-speculation doctrine
did not apply to Independence's application. In re
Application for Amend.

6

of an Augmentation Plan of Indep. Water &Sanitation
Dist., No. 19CW3220, at 5-7 (Dist. Ct., Water
Div. 1, Mar. 6, 2023) ("March 6 Order"). The water
court then entered a final decree approving
Independence's proposed amendment to its augmentation
plan. In re Application for Amend. of an Augmentation
Plan of Indep. Water &Sanitation Dist., No.
19CW3220, at 6 (Dist. Ct., Water Div. 1, May 2, 2023)
("Final Decree"). The Final Decree recited the
holding in East Cherry Creek that water courts may
not apply the anti-speculation doctrine when reviewing an
application for a determination of rights in nondesignated,
nontributary groundwater. Id. (citing E. Cherry
Creek, 109 P.3d at 158). This reference in the Final
Decree, read in conjunction with the water court's March
6 Order, apparently implied that the same rule applies in the
context of not-nontributary groundwater.
Id.

         ¶5
Opposers appeal the Final Decree, asserting that the
anti-speculation doctrine applies to Independence's
application to amend its augmentation plan and that the
record unambiguously demonstrates that Independence has not
satisfied that doctrine. Specifically, Opposers argue that
East Cherry Creek recognized a narrow exception to
the anti-speculation doctrine that applies only to
determinations of rights in nontributary
Denver Basin groundwater and that this exception does not
extend to applications to amend an augmentation plan
for not-nontributary groundwater. As a result,
Opposers claim, the anti-speculation

7

doctrine does apply to Independence's proposed amendment
to its augmentation plan, and the water court erred in
failing to apply it. Furthermore, because Independence has
never asserted a non-speculative intent with respect to
certain uses of the augmented water in its proposed amendment
to its augmentation plan, Opposers contend that this court
should not only reverse the water court's relevant
conclusions of law but also strike what Opposers describe as
Independence's speculative uses from the amended
augmentation plan.

         ¶6
Independence, in contrast, submits that the reasoning in
East Cherry Creek applies with equal force to the
not-nontributary groundwater at issue here. In other words,
Independence argues that both nontributary and
not-nontributary groundwater are allocated on the basis of
land ownership; accordingly, Independence maintains,
landowners must generally satisfy the same requirements for
obtaining a determination of rights in either nontributary or
not-nontributary groundwater. Therefore, because East
Cherry Creek precludes a water court from applying the
anti-speculation doctrine to applications for determinations
of rights in nontributary groundwater, the holding
in that case necessarily precludes a water court from
applying the anti-speculation doctrine to applications for
determinations of rights in not-nontributary
groundwater. Furthermore, Independence argues, because
applications for determinations of rights in not-nontributary
groundwater are "inexorably intertwined" with

8

applications to amend an augmentation plan for
not-nontributary groundwater, East Cherry Creek
forecloses application of the anti-speculation doctrine to
applications to amend an augmentation plan for
not-nontributary groundwater. Finally, Independence contends
that the anti-speculation doctrine plays no role in a water
court's review of augmentation plans in any event because
such a review focuses solely on the question of potential
injury. For these reasons, Independence asks that we adopt
the water court's reasoning and affirm the Final Decree.

         ¶7
We affirm the water court's order, albeit on somewhat
different grounds.

         ¶8
We begin by rejecting the water court's and
Independence's reliance on East Cherry Creek
because it does not resolve the narrow legal question
Opposers present: whether the anti-speculation doctrine
applies to an application to amend an augmentation plan for
not-nontributary groundwater. Instead, to answer this
question, we turn to the statutes governing the
anti-speculation doctrine and augmentation plans, as well as
our well-developed case law in both areas.

         ¶9
Considering these authorities, we hold that the water court
did not err in declining to apply the anti-speculation
doctrine to Independence's application to amend its
augmentation plan for not-nontributary groundwater. We reach
this conclusion for two related reasons.

         ¶10
First, because the anti-speculation doctrine and augmentation
plans serve different purposes, it does not make sense for
the water court to apply the doctrine

9

as part of its review of an application to obtain or amend an
augmentation plan. The anti-speculation doctrine exists to
protect the integrity of the prior appropriation system by
preventing would-be appropriators from hoarding water rather
than putting it to beneficial use. By contrast, augmentation
plans exist outside the prior appropriation system and afford
a mechanism to further Colorado's policy of maximum use
by allowing out-of-priority diversions of water that has
already been appropriated, provided that such diversions do
not result in injury to other water users. While the
anti-speculation doctrine protects the future of the prior
appropriation system, augmentation plans inject flexibility
into that system without injuring existing water rights.

         ¶11
Second, the only question relevant to a water court's
review of an augmentation plan (or an amendment thereto) is
whether the plan will cause injury to existing water rights.
While this inquiry necessarily leads the water court to
consider a number of factors-including whether the applicant
has put forward a proposed beneficial use-the sole purpose of
evaluating those factors is to identify potential injury to
existing water rights. The anti-speculation doctrine plays no
role in this injury analysis.

         ¶12
Here, the water court found that Independence's amended
augmentation plan will not result in injury to existing water
rights. We perceive no clear error

10

in this finding. Therefore, we affirm the water court's
approval of Independence's proposed amendment to its
augmentation plan.[3]

         I.
Factual and Procedural Background

         ¶13
We begin by explaining the relevant terms of the 2006 Decree.
We then describe Independence's application to amend the
augmentation plan that was initially approved as part of the
2006 Decree. Finally, we trace the water court proceedings
that brought this case before us.

         A.
The Initial Decree and Augmentation Plan

         ¶14
Under the 2006 Decree obtained by Independence's
predecessor-in-interest, Independence has 1,269 acre-feet per
year of nontributary groundwater available for withdrawal
from the Lower Dawson, Denver, Arapahoe, and Laramie-Fox
Hills aquifers. 2006 Decree, at 2. Relevant here, the 2006
Decree also includes 288.3 acre-feet per year of
not-nontributary groundwater available for withdrawal from
the Upper Dawson aquifer. Id. Both the nontributary
and the not-nontributary groundwater are decreed for
"use[], reuse[] and successive[] use[]" for
"domestic, industrial, commercial, irrigation, stock
watering, fire protection, and exchange and augmentation
purposes, both on and off the Subject Property."
Id.

11

         ¶15
In addition, the 2006 Decree approved a statutorily required
augmentation plan for the not-nontributary groundwater.
See § 37-90-137(9)(c.5)(I)(A), C.R.S. (2024)
(requiring "judicial approval of plans for augmentation
. . . prior to the use of" not-nontributary
groundwater). The augmentation plan permits withdrawals of up
to seventy-five of the 288.3 acre-feet per year of
not-nontributary groundwater decreed to be available. 2006
Decree, at 4. Notably, the plan lists only "inhouse and
irrigation use on the Subject Property" as uses for this
augmented water. Id. Finally, the plan designates
"[r]eturn flows from either or both inhouse and
irrigation use" as the sole source of water to replace
depletions from the permitted withdrawals during pumping and
reserves a portion of the decreed nontributary groundwater to
replace depletions after pumping. Id. at 5.

         B.
Independence's Application to Amend the 2006 Augmentation
Plan

         ¶16
Upon acquiring the interests described in the 2006 Decree,
Independence applied for an amendment to the augmentation
plan. The proposed amendment would not alter the 2006
Decree's limit on the withdrawal of not-nontributary
groundwater to seventy-five acre-feet per year. However, it
expands the list of uses included in the augmentation plan by
incorporating all the uses adjudicated

12

in the 2006 Decree-namely, "domestic,
municipal,[4] industrial, commercial, irrigation, stock
watering, fire protection, and exchange and augmentation
purposes, both on and off the Subject Property," in
addition to the inhouse and irrigation uses mentioned in the
original augmentation plan. Independence's application
did not specify how much (if any) of the seventy-five acre
feet it would allocate to each use. Nor did it describe a
plan to use any amount of this water off the Subject
Property.

         ¶17
In accordance with section 37-92-302(4), C.R.S. (2024), the
water referee for Division 1 consulted with the Division 1
Engineer, Corey DeAngelis, regarding Independence's
application. In a summary of their consultation, DeAngelis
requested that the water court require Independence to
"document that the claimed return flows from septic
systems and irrigation continue to cover the during-pumping
stream depletions in time, location and amount." And, to
the

13

extent that Independence could not demonstrate sufficient
return flows, DeAngelis stated that Independence "must
be required to pump water directly into the stream in the
amount that has not been replaced by return flows."

         ¶18
Numerous individuals and entities from neighboring
communities, including Opposers, filed statements of
opposition. Later, several opposers submitted comments on
initial and subsequent versions of the referee's proposed
ruling. Opposers' statements and comments raised multiple
concerns, including that Independence's application
violated the anti-speculation doctrine.

         ¶19
The referee's final ruling, issued in July 2021, did not
address Opposers' concerns. Accordingly, Opposers filed
protests reiterating, among other things, that
Independence's application did not comply with the
anti-speculation doctrine. Shortly thereafter, the water
court set the case for a five-day trial.

         ¶20
During discovery, Franktown submitted interrogatories to
Independence requesting that Independence provide the
"estimated annual amount of water" Independence
would dedicate to each of its proposed new uses of the
augmented water, as well as the locations in which it
proposed to exercise those uses. Viewing these
interrogatories as related to Franktown's claims under
the anti-speculation doctrine, Independence responded that it
was not required to make a threshold showing of
non-speculative use under this court's decision in
East Cherry Creek. Independence nevertheless
provided estimates of its annual municipal and

14

commercial demands.[5] Notably, Independence indicated that it
had "no specific plans" to use the augmented water
for domestic, industrial, exchange, or stockwatering
purposes. Similarly, Independence stated that it had no
specific plans to use its not-nontributary groundwater for
augmentation purposes other than those covered in the
original decree nor to use the augmented water for
any purpose in "any location other than the
Subject Property." Instead, Independence explained that
it "may need to put" that water to any of its
proposed uses to satisfy its "future water
obligations."

         C.
Opposers' Motion for Summary Judgment

         ¶21
Following discovery, Opposers moved for summary judgment
pursuant to C.R.C.P. 56, arguing that the anti-speculation
doctrine applies to an application to amend an augmentation
plan to cover new uses for not-nontributary groundwater. In
Opposers' view, Independence's discovery responses
indisputably showed that Independence could not make the
threshold showing of non-speculative intent required by the
anti-speculation doctrine with respect to its proposal to add
domestic, industrial, and stock-watering uses to its
augmentation plan. Nor could Independence make a showing of
non-speculative intent with

15

respect to its proposal to add any use off the Subject
Property. Accordingly, Opposers asked the water court to
dismiss Independence's application with respect to these
uses.[6]

         ¶22
In its response, Independence asserted that East Cherry
Creek precludes a water court from applying the
anti-speculation doctrine to determinations of rights in
Denver Basin groundwater, whether nontributary or
not-nontributary. In East Cherry Creek, this court
considered whether water courts must apply the
anti-speculation doctrine when adjudicating a Denver Basin
landowner's application for a determination of
nontributary groundwater rights. 109 P.3d at 157. We held
that water courts may not apply the anti-speculation doctrine
when determining Denver Basin nontributary groundwater rights
because the General Assembly reserved anti-speculation review
for the SEO's well-permitting process. Id. at
158. Independence argued that this holding in East Cherry
Creek necessarily prohibits a water court from applying
the anti-speculation doctrine to a

16

determination of rights in not-nontributary groundwater
because both not-nontributary and nontributary groundwater
are allocated on the basis of land ownership. Therefore,
Independence maintained, a water court is likewise
prohibited from applying the anti-speculation doctrine to an
application for an augmentation plan for not-nontributary
groundwater (or an amendment to such an augmentation plan).
Independence further contended that the anti-speculation
doctrine has no place in a water court's review of an
augmentation plan in any event because such a review
considers only whether implementation of the plan will
injuriously affect existing water rights.

         ¶23
The water court agreed with Independence. March 6 Order, at
1. It, too, read East Cherry Creek
as precluding a water court from applying the antispeculation
doctrine to a determination of rights in not-nontributary
groundwater. Id. at 4-5. The water court reasoned
that because landowners have a statutory right to adjudicate
their right to use Denver Basin groundwater for future,
undetermined uses, water courts performing such adjudications
may not apply the anti-speculation doctrine as part of their
review. Id. Instead, the water court explained,
anti-speculation review occurs only when the SEO considers an
application for a well permit which, if successful,
authorizes Denver Basin landowners to construct a well and,
therefore, to actually exercise their adjudicated rights.
Id.

17

         ¶24
The water court noted that, in this case, Independence's
predecessor-in-interest had already adjudicated the rights in
the 2006 Decree. Id. at 6. Therefore, Independence
had a vested right to apply its not-nontributary groundwater
to all uses listed in the 2006 Decree, including all
the uses Independence sought to add to the 2006 augmentation
plan. Id. The only question for the water court,
then, was whether Independence's proposed amended
augmentation plan would continue to avoid injury to other
water users. Id. Accordingly, the water court denied
Opposers' motion and concluded that, as a matter of law,
the antispeculation doctrine did not apply to
Independence's application. Id. at 7.

         D.
The Water Court's Final Decree

         ¶25
Following the March 6 Order, Independence and Opposers
stipulated to the entry of a final decree consistent with the
water court's order. However, Opposers preserved their
right to appeal the water court's conclusion that the
antispeculation doctrine did not apply to Independence's
application to amend its augmentation plan.

         ¶26
The water court accepted the parties' stipulations,
vacated the trial date, and entered a final decree. See
generally Final Decree. The Final Decree amends
Independence's augmentation plan in accordance with
Independence's proposal, confirming that Independence may
"use, reuse, and successive[ly] use" seventy-five
acre-feet of its not-nontributary water "for in-house,
municipal, domestic,

18

industrial, commercial, irrigation, stock watering, fire
protection, and exchange and augmentation purposes, on and
off the Subject Property." Id. at 2. The plan
continues to identify return flows as a means of replacing
depletions associated with these withdrawals. Id. at
3. However, in addition to return flows, and consistent with
the summary of consultation prepared by Division Engineer
DeAngelis, the plan requires Independence to directly release
nontributary groundwater to the potentially affected surface
streams if Independence's return flows prove inadequate
to replace all depletions. Id. Finally, the plan
includes provisions specifying how Independence will replace
post-pumping depletions. Id. at 3-4; see also
Danielson v. Castle Meadows, Inc., 791 P.2d 1106, 1115
(Colo. 1990) (requiring that augmentation plans for
not-nontributary groundwater provide for post-pumping
depletions).

         ¶27
The Final Decree also includes findings of fact and
conclusions of law. As relevant here, the water court found
that Independence's augmentation plan would not
injuriously affect vested water rights or decreed conditional
rights. Final Decree, at 5. In addition, citing East
Cherry Creek, 109 P.3d at 158, the water court observed
that, as a matter of law, the anti-speculation doctrine does
not apply to judicial determinations of nondesignated,
nontributary groundwater. Final Decree, at 6. Instead, the
water court explained, the anti-speculation doctrine is
"applied by the [SEO] during the well permitting
process." Id. Although the

19

water court did not expressly hold that the anti-speculation
doctrine does not apply to judicial determinations of
not-nontributary groundwater, the Final Decree
implied as much. See id.

         ¶28
Similarly, the water court did not expressly conclude that
the antispeculation doctrine does not apply to an application
to amend an augmentation plan for not-nontributary
groundwater. See id. However, it did conclude that
"an augmentation plan is intended to prevent injury to
owners or users of surface water or tributary
groundwater" and that, because Independence's
amended augmentation plan "will not injuriously
affect" such water rights, "it shall be
approved." Id. Accordingly, the water court
approved Independence's amended augmentation plan
consistent with Independence's proposal and without
performing an anti-speculation analysis. Id.

         ¶29
Opposers appealed the Final Decree.

         II.
Standard of Review

         ¶30
We review a water court's conclusions of law de novo.
Dill v. Yamasaki Ring, LLC, 2019 CO 14, ¶ 23,
435 P.3d 1067, 1074. In contrast, "[w]e accept the water
court's factual findings on appeal unless they are so
clearly erroneous as to find no support in the record."
Burlington Ditch Reservoir &Land Co. v. Metro
Wastewater Reclamation Dist., 256 P.3d 645, 660 (Colo.
2011), as modified on denial of reh'g (June 20,
2011).

20

         ¶31
Opposers have made clear that they are appealing the Final
Decree-indisputably a "judgment and decree" subject
to our review. C.A.R. 1(a)(2). We acknowledge, however, that
the Final Decree does not expressly conclude that a water
court may not apply the anti-speculation doctrine in
evaluating an application to amend an augmentation plan for
the use of not-nontributary groundwater. Further, we
recognize that to the extent the water court's order
denying Opposers' motion for summary judgment does reach
this conclusion, orders denying summary judgment are usually
"unappealable interlocutory ruling[s]." Manuel
v. Fort Collins Newspapers, Inc., 631 P.2d 1114, 1116
(Colo. 1981).

         ¶32
We do not view the absence from the Final Decree of an
express conclusion regarding the applicability of the
anti-speculation doctrine to an application to amend an
augmentation plan as a barrier to our review. The Final
Decree approved Independence's amendment to its
augmentation plan in full without applying the
anti-speculation doctrine based, at least in part, on the
water court's order denying Opposers' motion for
summary judgment. Final Decree, at 6. In addition, the Final
Decree specifically reflected the water court's finding
that the amended augmentation plan would not cause injury to
vested water rights or decreed conditional rights.
Id. at 5. Therefore, the Final Decree fully captures
the issues raised in this appeal.

21

         III.
Analysis

         ¶33
Because the heart of the parties' dispute is their
diverging interpretations of East Cherry Creek, we
begin with a discussion of that case and the parties'
arguments concerning it. Ultimately, however, we conclude
that East Cherry Creek does not answer the narrow
legal question before us: whether the anti-speculation
doctrine applies to a Denver Basin landowner's
application to amend an augmentation plan for
not-nontributary groundwater. To resolve that question, we
consider the principles underlying the anti-speculation
doctrine and the concept and requirements of augmentation
plans. We hold that the water court did not err in declining
to apply the anti-speculation doctrine to Independence's
application to amend its augmentation plan for
not-nontributary groundwater. Accordingly, we affirm the
water court's judgment and decree approving
Independence's amended augmentation plan.

         A.
East Cherry Creek

         Does
Not Resolve Whether the AntiSpeculation Doctrine Applies to
Independence's Application

         ¶34
East Cherry Creek concerned nontributary groundwater
in the Denver Basin. 109 P.3d at 157. To provide necessary
context for our discussion of East Cherry Creek, we
briefly review the legal framework governing Denver Basin
groundwater. We then discuss East Cherry Creek's
holding, present the parties'

22

conflicting views of that holding, and, finally, explain why
East Cherry Creek does not govern our decision
today.

         1.
Denver Basin Groundwater

         ¶35
The Denver Basin encompasses portions of the Dawson
(including Upper and Lower portions), Denver, Arapahoe, and
Laramie-Fox Hills aquifers that underlie an approximately
6,700-square-mile region covering much of the Front Range.
Parker Water &Sanitation Dist. v. Rein, 2024 CO
71M, ¶ 10, 559 P.3d 217, 223. Though groundwater in most
of Colorado is presumed to be tributary and, therefore,
subject to the prior appropriation system, N.
Kiowa-Bijou, 77 P.3d at 70, the General Assembly has
distinguished Denver Basin groundwater from other groundwater
in Colorado for two reasons, § 37-90-103(10.5), C.R.S.
(2024). First, Denver Basin groundwater carries immense
economic importance relative to its de minimis impact on
surface streams. Id. Second, it is feasible to
account for those de minimis impacts by replacing the limited
surface water depletions associated with pumping from the
Denver Basin. Id.; Water Rts. of Park Cnty.
Sportsmen's Ranch LLP v. Bargas, 986 P.2d 262, 266
(Colo. 1999), as modified on denial of reh'g
(Oct. 4, 1999).

         ¶36
For these reasons, the General Assembly crafted a
classification and administration scheme that is unique to
the Denver Basin. N. Kiowa-Bijou, 77 P.3d at 73
n.19. Specifically, Denver Basin groundwater is divided into
two categories:

23

(1) nontributary groundwater, defined, like nontributary
groundwater in other parts of Colorado, as groundwater
"the withdrawal of which will not, within one hundred
years of continuous withdrawal, deplete the flow of a natural
stream . . . at an annual rate greater than one-tenth of one
percent of the annual rate of withdrawal," §
37-90-103(10.5). But see Bargas, 986 P.2d at 265,
267 (explaining the hydrostatic pressure assumption, which
applies only when determining whether Denver Basin
groundwater is nontributary); and (2) not-nontributary
groundwater, which exists only in the Denver Basin and is
defined as groundwater that does not meet the definition of
nontributary groundwater because withdrawing it
"will, within one hundred years, deplete the
flow of a natural stream . . . at an annual rate of greater
than one-tenth of one percent of the annual rate of
withdrawal," § 37-90-103(10.7) (emphasis added);
see also Bargas, 986 P.2d at 274-75 (clarifying that
not-nontributary groundwater is statutorily limited to the
Denver Basin).

         ¶37
Nontributary groundwater throughout Colorado is not allocated
under the prior appropriation system, but rather "upon
the basis of ownership of the overlying land." §
37-90-102(2), C.R.S. (2024); see also Parker, ¶
21, 559 P.3d at 227. This statutory scheme confers upon
landowners an inchoate right to control and use the
nontributary groundwater beneath their land that vests when
the SEO issues a well permit or when the water court issues a
decree determining the

24

landowner's rights in the underlying groundwater.
Parker, ¶¶ 19, 21, 559 P.3d at 227; N.
Kiowa-Bijou, 77 P.3d at 71-72. Not-nontributary
groundwater is also "administered on the basis of land
ownership ...." N. Kiowa-Bijou, 77 P.3d at 74.
Unlike nontributary groundwater, however, Denver Basin
landowners must obtain "judicial approval of plans for
augmentation . . . prior to the use of [their
not-nontributary] groundwater." §
37-90-137(9)(c.5)(I)(A).

         2.
East Cherry Creek

         ¶38
In East Cherry Creek, we were asked to decide
whether water courts must apply the anti-speculation doctrine
as part of adjudicating a Denver Basin landowner's
application for a determination of rights in nontributary
groundwater. 109 P.3d at 157. We held that water courts may
not apply the doctrine in this context. Id. at 158.
We began by explaining that section 37-90-137(6) allows
Denver Basin landowners to commence adjudication proceedings
"at any time" to seek a determination of rights
"not only for existing, but also for future, uses."
E. Cherry Creek, 109 P.3d at 157. Thus, in
contrast to a conditional use right-the context in which we
first announced the antispeculation doctrine, Colo. River
Water Conservation Dist. v. Vidler Tunnel Water Co., 594
P.2d 566, 569 (Colo. 1979)-a determination of rights in
nontributary groundwater neither requires applicants to
present a date by which they will begin a withdrawal project
nor to show reasonable diligence towards completing such a

25

project. E. Cherry Creek, 109 P.3d at 157. Allowing
a water court to apply the antispeculation doctrine at the
adjudication stage would, therefore, "thwart a clearly
expressed legislative intent to permit adjudication for
future uses without a corresponding obligation to develop
them." Id. at 158.

         ¶39
Nevertheless, we continued, "the legislature has also
made clear . . . that nontributary ground water may be
withdrawn solely for beneficial uses." Id. To
satisfy this condition, we explained that the legislature
requires a Denver Basin landowner who seeks to use their
nontributary groundwater to obtain a permit from the SEO.
Id. Under that permitting scheme, the SEO may issue
a permit authorizing a Denver Basin landowner to construct a
well only if that landowner demonstrates that the
nontributary groundwater will be put to a beneficial use.
Id.; see also § 37-90-137(1)(b)(II)
(requiring that permit applicants specify their
"proposed beneficial use"); § 37-90-137(4)(a)
(clarifying that the permit requirements in sections
37-90-137(1) and (2) apply to permits for nontributary and
not-nontributary groundwater).

         ¶40
Accordingly, we held that the legislature established "a
clear demarcation between," on the one hand, "the
determination of available water underlying particular
lands," and on the other, "the regulation of its
withdrawal and use." E. Cherry Creek, 109 P.3d
at 158. Because the legislature delegated the latter to the
SEO, we concluded that the legislature directed the SEO to
apply the anti-

26

speculation doctrine as part of its permitting process,
thereby precluding water courts from applying the doctrine
when adjudicating rights in nontributary groundwater.
Id.

         3.
The Parties' Arguments Concerning East
Cherry Creek

         ¶41
Opposers construe East Cherry Creek as announcing a
"limited exception" to the anti-speculation
doctrine that applies only to determinations of
rights in nontributary Denver Basin
groundwater. Thus, they argue, East Cherry Creek has
no bearing on whether water courts may apply the
anti-speculation doctrine in reviewing an application to
amend an augmentation plan for not-nontributary
groundwater. In the context of such applications,
Opposers submit that because only the water court can approve
an augmentation plan (or an amendment thereto), application
of the anti-speculation doctrine cannot be relegated to the
SEO as it is in the context of a determination of rights in
nontributary groundwater under East Cherry Creek.
Rather, Opposers maintain, only the water court has the
authority to apply the anti-speculation doctrine here because
only the water court has the authority to review an
augmentation plan.

         ¶42
Independence, in contrast, contends that a water court may
not apply the anti-speculation doctrine to an application to
amend an augmentation plan for not-nontributary groundwater
for three reasons.

27

         ¶43
First, Independence argues that East Cherry Creek
applies with equal force to determinations of rights in
not-nontributary groundwater because, like
nontributary groundwater, not-nontributary groundwater is
allocated on the basis of land ownership for purposes of any
present or future use. Accordingly, Independence maintains,
the same factors that determine the availability of
nontributary Denver Basin groundwater determine the
availability of not-nontributary groundwater. Those
factors do not, in Independence's view, include
compliance with the anti-speculation doctrine.

         ¶44
Second, Independence contends that the water court's
approval of an augmentation plan for not-nontributary
groundwater (or an amendment thereto) is "inexorably
intertwined" with the determination-of-rights process.
Therefore, in Independence's view, because East
Cherry Creek prohibits a water court from applying the
anti-speculation doctrine when reviewing an application for a
determination of rights in not-nontributary groundwater, the
reasoning of that decision also prohibits a water court from
applying the doctrine when reviewing an application for an
augmentation plan for not-nontributary groundwater (or an
application to amend such a plan).

         ¶45
Finally, Independence asserts, separate and apart from
East Cherry Creek, that a water court's review
of an application for an augmentation plan does not implicate
the anti-speculation doctrine because the only question
before the water

28

court in such proceedings is whether the augmentation plan
will result in injury to existing water rights.

         4.
East Cherry Creek Does Not Apply
Here

         ¶46
To the extent Opposers argue that East Cherry Creek
does not govern this case, we agree. As an initial matter,
the circumstances of East Cherry Creek required the
water court to examine a Denver Basin landowner's
determination of rights in nontributary
groundwater. 109 P.3d at 156-57. By contrast, the application
here seeks to amend an augmentation plan for
not-nontributary groundwater. East Cherry
Creek does not address whether a water court must apply
the anti-speculation doctrine to an application for a
determination of rights in not-nontributary
groundwater. Nor is it necessary for us to reach that
question because the application here concerns only an
amendment to an existing augmentation plan.

         ¶47
Relatedly, we reject Independence's assertion that the
approval of an augmentation plan for not-nontributary
groundwater is "inexorably intertwined" with a
determination of rights in the water to be augmented. A
Denver Basin landowner pursues a determination of rights to
vest their inchoate rights in Denver Basin groundwater.
Id. at 157; N. Kiowa-Bijou, 77 P.3d at 74.
Those applying for an augmentation plan, in contrast, seek
judicial approval of a plan to divert water out of priority
to the extent they can do so without causing injury to
existing water rights by replacing their out-of-priority
depletions with water from

29

a legally available source. Empire Lodge Homeowners'
Ass'n v. Moyer, 39 P.3d 1139, 1150 (Colo. 2001),
as modified on denial of reh'g (Feb. 11, 2002).
Although Denver Basin landowners may not exercise their
vested rights in not-nontributary groundwater without an
augmentation plan, nothing precludes them from obtaining a
determination of rights before they secure the water
court's approval of an augmentation plan. Indeed, that is
precisely what Independence's predecessor-in-interest did
with respect to the amount of not-nontributary groundwater
included in the 2006 Decree for which neither Independence
nor Independence's predecessor has ever proposed an
augmentation plan.

         ¶48
The question we must answer here is whether the water court
erred in declining to apply the anti-speculation doctrine to
an application to amend an augmentation plan for
not-nontributary groundwater. East Cherry Creek did
not address this question. Accordingly, we look elsewhere to
resolve it.

         B. The
Water Court Did Not Err in Declining to Apply the
Anti-Speculation Doctrine to Independence's Application

         ¶49
To address Opposers' contention that the water court
erred in failing to apply the anti-speculation doctrine to
Independence's application for an amendment to its
augmentation plan, we consider the relationship between the
issues underlying a water court's review for compliance
with the anti-speculation doctrine on the one hand, and the
issues involved in a water court's consideration

30

of an application for an augmentation plan on the other. We
conclude that the water court did not err in declining to
apply the anti-speculation doctrine to Independence's
application to amend its augmentation plan in
not-nontributary groundwater for two reasons: (1) the
anti-speculation doctrine and augmentation plans serve
different purposes, and (2) the only question relevant to a
water court's review of an augmentation plan (or an
amendment thereto) is whether the plan will cause injury to
existing water rights.

         1.
The Anti-Speculation Doctrine and Augmentation Plans Serve
Different Purposes

         ¶50
At its core, the anti-speculation doctrine precludes a water
rights applicant from claiming an intent to appropriate water
"based upon the subsequent speculative sale or transfer
of the appropriative rights." City of Thornton v.
Bijou Irrigation Co., 926 P.2d 1, 36 (Colo. 1996). To
accomplish this objective, those seeking to appropriate water
or to change a water right must demonstrate that they have
"a specific plan and intent to divert, store, or
otherwise capture, possess, and control a specific quantity
of water for specific beneficial uses." §
37-92-103(3)(a), C.R.S. (2024); High Plains A &M, LLC
v. Se. Colo. Water Conservancy Dist., 120 P.3d 710,
719-21 (Colo. 2005) (applying the anti-speculation doctrine
to applications for a change of water right to ensure that
change proceedings fulfill their "essential
function" of "confirm[ing] that a valid
appropriation continues"); see also Vidler, 594
P.2d at 568 (noting that applicants

31

seeking to appropriate water "must have an intent to
take the water and put it to beneficial use"). Thus, the
purpose of the anti-speculation doctrine is to prevent water
hoarding for personal profit, thereby preserving water for
beneficial use within the prior appropriation system.
Vidler, 594 P.2d at 568.

         ¶51
Unlike the anti-speculation doctrine, which is designed to
protect the integrity of appropriations within the prior
appropriation system, augmentation plans exist specifically
to "allow[] a diversion outside of the priority
system." Empire Lodge, 39 P.3d at 1155
(emphasis added); see also Buffalo Park Dev. Co. v.
Mountain Mut. Reservoir Co., 195 P.3d 674, 685 (Colo.
2008) (explaining that augmentations plans "allow
diversions in areas where they would not be possible
otherwise" because "unappropriated water is not
available" there), as modified on denial of
reh'g (Nov. 24, 2008). To accomplish this,
augmentation plans describe "a detailed program . . . to
increase the supply of water available for beneficial
use" by, as relevant here, "providing substitute
supplies of water." § 37-92-103(9). The substitute
supply must offset the applicant's proposed
out-of-priority depletions in an amount sufficient to prevent
injury. See § 37-92-305(3)(a), C.R.S. (2024);
Empire Lodge, 39 P.3d at 1150. Thus, augmentation
plans offer a method by which to "implement a policy of
maximum flexibility" while also "protect[ing] the
constitutional doctrine of prior appropriation."
Empire Lodge, 39 P.3d at 1150.

32

         ¶52
Given the distinct purposes of the anti-speculation doctrine
and augmentation plans, applying the anti-speculation
doctrine to applications for such plans (or amendments
thereto) would make no sense. Augmentation plans permit
diversions of water that other users have already
appropriated by ensuring that a supply sufficient to avoid
injury to those users is available for replacement purposes,
thereby protecting existing water rights while advancing
Colorado's policy of maximum use. See id. This
scheme could not encourage hoarding water "for personal
profit" to the exclusion of future users seeking to
appropriate that water for a beneficial use, Vidler,
594 P.2d at 568, because the augmented water is not available
for appropriation in the first place, Buffalo Park,
195 P.3d at 685. Nor could an augmentation plan threaten to
transform an existing appropriative right into a speculative
right, High Plains, 120 P.3d at 720, because
augmentation plans merely ensure that existing water-rights
holders can continue to exercise their appropriative rights
in the water to be augmented (albeit with the replacement
supply). Thus, applying the anti-speculation doctrine to
applications for an augmentation plan (or applications to
amend such plans) would not serve the purpose of such plans:
to accommodate diversions of water outside the priority

33

system by providing a substitute supply sufficient to prevent
injury to other appropriators.[7]

         2. The
Sole Inquiry in Reviewing an Augmentation Plan Application Is
Whether the Plan Will Injure Existing Water Rights

         ¶53
Under section 37-92-305(3)(a), a water court's task in
reviewing an augmentation plan is to determine whether the
proposed plan will "injuriously affect" vested
water rights or decreed conditional rights. Performing this
injury

34

analysis requires that water courts "consider the
depletions from an applicant's use or proposed use of
water, in quantity and in time, [and] the amount and timing
of augmentation water that would be provided by the
applicant." § 37-92-305(8)(a). If the water court
determines that the proposed augmentation plan will not
result in injury, it "shall" approve the plan.
§ 37-92-305(3)(a); see also Upper Eagle Reg'l
Water Auth. v. Simpson, 167 P.3d 729, 735 (Colo. 2007)
("[O]nly if operation of the [augmentation] plan would
cause injury . . . does the statute require the water judge
to deny the plan."), as modified on denial of
reh'g (Oct. 1, 2007).

         ¶54
The same statutory requirements that govern applications for
new augmentation plans also govern an application that, like
Independence's, seeks to amend an existing augmentation
plan. Coors Brewing Co. v. City of Golden, 2018 CO
63, ¶ 25 n.1, 420 P.3d 977, 984 n.1 (explaining that
amendments to an augmentation plan "must, at a minimum,
comply with the requirements of both subsections
37-92-305(3), (5), and (8) and our case precedents");
cf. Crystal Lakes Water &Sewer Ass'n v.
Backlund, 908 P.2d 534, 542 (Colo. 1996) (explaining
that water courts have the authority to "define the
scope" of an augmentation plan and otherwise
"adjust such a plan upon reconsideration").
Similarly, augmentation plans for not-nontributary
groundwater must generally satisfy the same statutory
criteria as

35

augmentation plans for tributary water.[8] §
37-90-137(9)(c.5)(I)(B), (C) (requiring that augmentation
plans permitting the use of not-nontributary groundwater
"meet all other statutory criteria" associated with
augmentation plans); see also Danielson, 791 P.2d at
1113 ("[T]he General Assembly, by using the term
'plans for augmentation' in section
37-90-137(9)(c) [later renumbered section
37-90-137(9)(c.5)], intended that the term carry the same
meaning in that subsection as elsewhere in the statutes
governing water resources.").

         ¶55
In sum, under section 37-92-305(3)(a), a water court asked to
approve an application for an augmentation plan (or an
amendment thereto) is concerned with a single question,
regardless of the type of water to be augmented: whether the
proposed plan will result in injury to vested water rights or
decreed conditional

36

rights.[9] Though answering this question may require
the water court to consider multiple factors, its focus
remains the same: "to ascertain whether vested water
rights will sustain injury." Upper Eagle Reg'l
Water Auth., 167 P.3d at 735.

         ¶56
For example, an applicant for an augmentation plan may need
to estimate the "time, amount, and location of return
flows" associated with its proposed out-of-priority
diversions if the applicant plans to rely on return flows to
ensure that water is available in the quantity and at the
time necessary to prevent injury. Farmer's Reservoir
&Irrigation Co. v. Consol. Mut. Water Co., 33 P.3d
799, 808 &n.6 (Colo. 2001), as modified on denial of
reh'g (Nov. 13, 2001). To estimate return flows

37

with the degree of certainty that this injury analysis
requires, the applicant must put forward proposed beneficial
uses of the augmented water, consistent with the statutory
definition of augmentation plans. § 37-92-103(9)
(defining an augmentation plan as a "detailed program .
. . to increase the supply of water available for beneficial
use"). Thus, a water court could not approve an
augmentation plan if the applicant entirely failed to
identify any proposed beneficial use but then purported to
rely exclusively on return flows as a substitute supply for
replacing depletions. This is because, in such a scenario,
the applicant would have failed to "identify the sources
and character of the substitute supplies with
certainty," creating an intolerable risk of injury.
Centennial Water &Sanitation Dist. v. City &Cnty.
of Broomfield, 256 P.3d 677, 683 (Colo. 2011); see
also Buffalo Park, 195 P.3d at 684 (explaining that
applicants "must first establish . . . the availability
of replacement water" before demonstrating that their
proposed depletions will not cause injury (quoting City
of Aurora ex rel. Util. Enter. v. Colo. State Eng'r,
105 P.3d 595, 615 (Colo. 2005))); Williams v. Midway
Ranches Prop. Owners Ass'n, 938 P.2d 515, 522 (Colo.
1997) ("An essential component of an augmentation plan
is the provision for adequate replacement water.");
Weibert v. Rothe Brothers, Inc., 618 P.2d 1367, 1373
(Colo. 1980) ("In order to determine the adequacy of the
[augmentation] plan to accomplish its intended purpose, it is
necessary to consider the adequacy of the replacement water
rights.").

38

         ¶57
But the fact that an augmentation plan applicant may propose
specific beneficial uses for its augmented water to prove
that the plan will not result in injury does not mean that
the applicant must demonstrate an intent to put that
augmented water to those beneficial uses, as the
anti-speculation doctrine requires. §
37-92-103(3)(a)(II) (requiring "a specific plan and
intent to divert, store, or otherwise capture, possess, and
control a specific quantity of water for
specific beneficial uses" (emphases added));
see also Vidler, 594 P.2d at 568-69; High
Plains, 120 P.3d at 720. Rather, applicants need only
show that if the beneficial use of their augmented water
changes, they will still have sufficient supplies of
replacement water to prevent injury. Farmer's
Reservoir &Irrigation Co., 33 P.3d at 808 n.6. Thus,
the statutory scheme governing augmentation plans tolerates
some degree of uncertainty in the future operation of the
plan to "implement a policy of maximum flexibility that
also protect[s] the constitutional doctrine of prior
appropriation." Empire Lodge, 39 P.3d at 1150.

         ¶58
Indeed, a water court decree approving an augmentation plan
represents no more than a "prediction of how
the plan can operate" to permit out-of-priority
diversions "without causing injury to existing water
rights." Well Augmentation Subdistrict of Cent.
Colo. Water Conservancy Dist. v. Centennial Water
&Sanitation Dist., 2019 CO 12, ¶ 10, 435 P.3d
469, 472 (emphasis added). Approving a "prediction"
of how an augmentation plan will operate does not require the
water

39

court to consider the applicant's intent to execute that
plan. The "prediction" remains valid regardless of
when the decree-holder begins to operate the plan.

         ¶59
For these reasons, we hold that the water court did not err
in declining to apply the anti-speculation doctrine to
Independence's application to amend its augmentation
plan. Therefore, we need only review the water court's
determination that Independence's amended augmentation
plan will not result in injury.

         C.
Independence's Proposed Augmentation Plan, as Amended,
Will Not Result in Injury

         ¶60
The water court found that Independence's amended
augmentation plan "will not injuriously affect the owner
of or persons entitled to use water under a vested water
right or a decreed conditional water right." Final
Decree, at 5. Opposers have not contested this finding. And
even if they had, we perceive no basis for characterizing the
water court's finding as clearly erroneous.
Independence's application estimates that its return
flows from irrigation alone will equal almost four times its
estimated actual depletions. Id. at 2-3. And even if
Independence's return flows ultimately prove inadequate,
the augmentation plan requires that Independence use its
abundant nontributary groundwater to replace all depletions.
Id. at 2.

         ¶61
Therefore, we affirm the water court's conclusion that
Independence's amended augmentation plan will not result
in injury to existing water rights.

40

         IV.
Conclusion

         ¶62
The anti-speculation doctrine requires that potential
appropriators demonstrate an intent to put the water rights
they seek to a beneficial use, thereby preventing those who
seek to hold such rights only for potential future profit
from obtaining a use right. N. Kiowa-Bijou, 77 P.3d
at 78-79. Accordingly, potential appropriators must present a
specific plan and intent to divert a
specific quantity of water for specific
beneficial uses. § 37-92-103(3)(a)(II). This requirement
protects the integrity of the prior appropriation system by
reinforcing the constitutional guarantee of "a right to
appropriate, not a right to speculate." Vidler,
594 P.2d at 568.

         ¶63
In contrast, an augmentation plan is merely a tool designed
to increase the amount of water available for some
beneficial use at some point in time without causing
injury to vested water rights or conditional decreed rights.
§ 37-92-103(9). Judicial approval of a proposed
augmentation plan (or an amendment thereto) may require the
water court to consider multiple factors-such as the quantity
and timing of depletions, the amount of likely return flows,
and the beneficial uses for the augmented water-to the extent
necessary to confirm that the proposal will not result in
injury. §§ 37-92-103(9), -305(8)(a); Upper
Eagle Reg'l Water Auth., 167 P.3d at 735. This
injury inquiry does not require a water court to ascertain an
augmentation plan applicant's specific intent with
respect to the use of the water

41

to be augmented. Rather, the water court need only determine
whether the applicant's plan, as proposed, will prevent
injury. That is precisely what the water court did here.

         ¶64
Accordingly, because we perceive no clear error in the water
court's finding that Independence's amended
augmentation plan will not result in injury, we affirm the
water court's judgment and decree.

42

         
JUSTICE GABRIEL, concurring in the judgment.

         ¶65
The majority holds that the water court did not err in
declining to apply the anti-speculation doctrine to
Independence Water and Sanitation District's application
to amend its augmentation plan for not-nontributary
groundwater. Maj. op. ¶ 9. The majority principally
bases this conclusion on its view that the anti-speculation
doctrine and augmentation plans serve different purposes and,
therefore, it makes no sense for a water court to apply the
anti-speculation doctrine in connection with its review of an
application to obtain or amend an augmentation plan.
Id. at ¶ 10. On this basis, the majority
affirms the water court's judgment and decree.
Id. at ¶ 64.

         ¶66
Although I agree with the majority's ultimate conclusion,
I cannot agree with its reasoning. Accordingly, I
respectfully concur in the judgment, only.

         I.
Analysis

         ¶67
No party in this case has argued that the anti-speculation
doctrine never applies to an application to obtain or amend
an augmentation plan, as the majority now effectively holds.
Accordingly, I do not believe that the parties have been
given a full and fair opportunity to be heard on that
question.

         ¶68
Nor did the water court rule on the broad ground on which the
majority bases its ruling. Rather, relying on East Cherry
Creek Valley Water &Sanitation District v. Rangeview
Metropolitan District, 109 P.3d 154, 157-58 (Colo.
2005), the

43

water court began with the apparently undisputed premise that
because a landowner has the statutory right to adjudicate the
right to use Denver Basin nontributary, nondesignated
groundwater for future, undetermined uses, the
anti-speculation doctrine does not apply to adjudications of
that right. The court then observed that we recognized in
Colorado Ground Water Commission v. North Kiowa-Bijou
Groundwater Management District, 77 P.3d 62, 74 (Colo.
2003), that Denver Basin groundwater located outside of a
designated basin that is partially tributary because it does
not satisfy the definition of Denver Basin nontributary
groundwater (i.e., not-nontributary groundwater) "shall
nevertheless be administered on the basis of land ownership
as if it were nontributary, provided its use is
augmented." Accordingly, the water court concluded that
for the same reasons that the anti-speculation doctrine is
inapplicable to adjudications of Denver Basin nontributary,
nondesignated groundwater, that doctrine is inapplicable to
adjudications of the not-nontributary groundwater at issue
here, which, by definition, is nondesignated Denver Basin
groundwater subject to the same separate water use system
that applies to nontributary groundwater. (In reaching this
conclusion, the water court did not rely solely on East
Cherry Creek, as the majority seems to suggest. Maj. op.
¶¶ 4, 8. Rather, it so concluded by reading
East Cherry Creek together with North
Kiowa-Bijou Groundwater Management District.)

44

         ¶69
Having thus decided that the not-nontributary groundwater at
issue should be treated like Denver Basin nontributary water,
the water court turned to the narrow issue presented and
observed that Independence had already obtained water court
approval to use not-nontributary Upper Dawson groundwater for
certain decreed uses and therefore had a vested right to do
so. Thus, the court viewed the only question before it as
concerning the changes required to the augmentation plan to
avoid injury to out-of-priority depletions that Independence
would cause when it used its not-nontributary Upper Dawson
groundwater for the decreed purposes. In these circumstances,
the court concluded, as a matter of law, that the
anti-speculation doctrine did not apply to Independence's
request to add previously adjudicated uses to the
augmentation plan.

         ¶70
In light of the foregoing, unlike the majority, I perceive no
reason to adopt a broad rule, which neither the parties nor
the water court below advanced, that the anti-speculation
doctrine never applies to an application to obtain or amend
an augmentation plan. Rather, I would simply follow the water
court's narrower reasoning, which I believe is well
supported by our case law.

         ¶71
I believe that the foregoing analysis is more in line with
the arguments that the parties actually presented to us. It
is also more consistent with long-settled principles of
judicial restraint, which dictate that courts should decide
only the issues necessary to resolve the cases before them-no
more and no less.

45

         IL
Conclusion

         ¶72
For these reasons, I respectfully concur in the judgment,
only.

---------

Notes:

[1] The Denver Basin encompasses those
portions of the Dawson (including the Upper and Lower
portions), Denver, Arapahoe, and Laramie-Fox Hills aquifers
that underlie an approximately 6,700-square-mile region
"stretching from Greeley on the north, Colorado Springs
on the south, the front-range hogback on the west, and Limon
on the east." Parker Water & Sanitation Dist. v.
Rein, 2024 CO 71M, ¶ 10, 559 P.3d 217, 223 (quoting
Colo. Ground Water Comm'n v. N. Kiowa-Bijou
Groundwater Mgmt. Dist., 77 P.3d 62, 72 (Colo.
2003)).

[2] "Nontributary groundwater"
refers to groundwater "the withdrawal of which will not,
within one hundred years of continuous withdrawal, deplete
the flow of a natural stream . . . at an annual rate greater
than one-tenth of one percent of the annual rate of
withdrawal." § 37-90-103(10.5), C.R.S. (2024).
Not-nontributary groundwater, by contrast, describes
groundwater in the Denver Basin "the withdrawal of which
will, within one hundred years, deplete the flow of
a natural stream . . . at an annual rate of greater than
one-tenth of one percent of the annual rate of
withdrawal." § 37-90-103(10.7) (emphasis added);
see also Water Rts. of Park Cnty. Sportsmen's Ranch
LLP v. Bargas, 986 P.2d 262, 274-75 (Colo. 1999)
(clarifying that not-nontributary groundwater exists only in
the Denver Basin), as modified on denial of
reh'g (Oct. 4, 1999). Both nontributary and
not-nontributary groundwater are, by definition,
nondesignated groundwater. § 37-90-103(10.5), (10.7).
"Designated groundwater" is groundwater that
"in its natural course would not be available to and
required for the fulfillment of decreed surface rights"
or that is located "in areas not adjacent to a
continuously flowing natural stream" where groundwater
is the "principal" water source. §
37-90-103(6)(a). Though designated groundwater exists in the
Denver Basin, see N. Kiowa-Bijou, 77 P.3d at 77-78,
none of the groundwater at issue here is designated.
Therefore, our discussions of groundwater in this opinion
refer to nondesignated groundwater, unless otherwise
stated.

[3] To the extent the Final Decree implied
that water courts may not apply the antispeculation doctrine
when determining a Denver Basin landowner's rights in
not-nontributary groundwater, we express no opinion on that
issue.

[4] The 2006 Decree does not mention
municipal use, either in the list of decreed uses or in the
augmentation plan. See 2006 Decree, at 2, 4. The
water court assumed that Independence's application
either erroneously included municipal uses, or that
Independence had withdrawn that aspect of its proposal.
However, Independence's answer brief before this court
clarifies that its application sought to add municipal use to
both its list of decreed uses and its augmentation plan.
Nevertheless, the Final Decree includes municipal use only in
the amended augmentation plan; it does not add municipal use
to the list of decreed uses. Final Decree, at 1-2. Opposers
do not argue that the absence of municipal use from
Independence's list of decreed uses precludes
Independence from putting its not-nontributary groundwater to
municipal use in accordance with its amended augmentation
plan. Therefore, we do not consider this question
here.

[5] Specifically, Independence predicted
that it would need 0.84 acre-feet per year to serve a future
community clubhouse, representing both a municipal and a
commercial use. In addition, it estimated that it would need
7.59 acre-feet per year for irrigation, which it listed as a
municipal use.

[6] Opposers have not challenged the
in-house, irrigation, augmentation, or exchange uses to the
extent that they were already covered by the augmentation
plan as approved under the 2006 Decree. Nor have they
challenged the addition of municipal or commercial uses to
the extent that Independence's discovery responses
detailed a specific plan with respect to those uses. They
also have not challenged Independence's proposal to add a
fire protection use. Accordingly, this case concerns only
Independence's proposal to add domestic, industrial, and
stock-watering uses to its existing augmentation plan, as
well as any use of augmented water off the Subject
Property.

[7] Our conclusion is consistent with
proceedings that involve augmentation plans in the tributary
context. For example, applicants for a conditional water
right in tributary water that would injure senior
appropriators may not receive a decree "except in
conjunction with a plan for augmentation assuring enough
available water to exercise the right." Fox v. Div.
Eng'r for Water Div. 5, 810 P.2d 644, 645 (Colo.
1991). In those circumstances, applicants must comply with
the antispeculation doctrine because they are seeking a
conditional water right. E.g., City of
Thornton, 926 P.2d at 30. In contrast, such applicants
must secure approval of an augmentation plan to prevent
injury that would otherwise result from exercising their
conditional rights. See Lionelle v. Se. Colo. Water
Conservancy Dist., 676 P.2d 1162, 1168 (Colo. 1984)
(holding that conditional water rights applicants could not
receive a decree until they applied for an augmentation plan
because exercising their proposed conditional water right
would result in injury). Similarly, because augmentation plan
applicants must show that their source of replacement water
is "legally available," Empire Lodge, 39
P.3d at 1150, applicants planning to use replacement water
that is subject to the anti-speculation doctrine would have
had to comply with that doctrine as part of applying for a
determination of rights in the replacement water, see
Williams v. Midway Ranches Prop. Owners Ass'n, 938
P.2d 515, 522 (Colo. 1997) (noting that replacement water may
include "tributary native water which has been
quantified by historic beneficial use"). Thus,
antispeculation concerns underlying determinations of rights
are separate and distinct from the injury concerns underlying
augmentation plans associated with those rights.

[8] The sole distinction between
augmentation plans for tributary water and augmentation plans
for not-nontributary groundwater lies in how augmentation
plan applicants determine the amount of replacement water
they must provide. Tributary water users must determine, on a
case-by-case basis, the amount of replacement water necessary
to prevent injury. See Buffalo Park, 195 P.3d at
684-85. Not-nontributary water users, on the other hand, must
follow specific statutory requirements that determine the
amount of replacement water they must make available based on
(1) the aquifer from which the groundwater will be withdrawn,
and (2) for some aquifers, the distance between the point of
withdrawal and a contact with a natural stream. §
37-90-137(9)(c.5)(I). All of Independence's potential
not-nontributary wells would withdraw groundwater from the
Upper Dawson aquifer, where "decrees approving plans for
augmentation must provide for the replacement of actual
out-of-priority depletions to the stream." §
37-90-137(9)(c.5)(I)(B).

[9] Like augmentation plans, change
applications are also subject to section 37-92-305(3)(a);
thus, they "shall be approved" if the water court
determines that the proposed change will not result in
injury. Nevertheless, we have held that water courts must
also apply the anti-speculation doctrine when reviewing an
application for a change of water right. High
Plains, 120 P.3d at 720-21; cf. Harvey W.
Curtis et al., The Anti-Speculation Doctrine Extended to
Change of Water Rights Cases: A New Dilemma for Water Rights
Owners, 9 U. Denv. Water L. Rev. 577, 594-96 (2006)
(critiquing High Plains's deviation from the
"straightforward, time-honored non-injury standard[]
mandated by Colorado Revised Statute 37-92-305(3)").
Critically, however, change applications are distinct from
augmentation plan applications because "[t]he essential
function of the change proceeding is to confirm that a valid
appropriation continues in effect under decree
provisions that differ from those contained in the prior
decree." High Plains, 120 P.3d at 719 (emphasis
added). The statutory definition of an
"appropriation" includes the requirement that an
appropriation be non-speculative. § 37-92-103(3)(a).
Augmentation plans, in contrast, neither create nor alter
appropriative water rights. See Buffalo Park, 195
P.3d at 685-86. Therefore, they do not implicate the concerns
that animated our extension of the anti-speculation doctrine
to change applications in High Plains.

---------